UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                  :

UNITED STATES OF AMERICA,         :
                                  :

           -against-            :         13 Crim. 8 (JPO)
                                  :

HERMAN AVERY GUNDY,          :      MEMORANDUM AND
                    Defendant.    :         ORDER
                                  :
-------------------------------------------------------------X

J. PAUL OETKEN, District Judge:

      Defendant Herman Avery Gundy is charged with one count of failing to register as a sex

offender under the Sex Offender Registration and Notification Act, 18 U.S.C. § 2250.  Gundy

has moved to dismiss the Indictment.  For the reasons that follow, his motion is granted.

**I.      Background**

      On July 11, 1994, Gundy pleaded guilty in the Eastern District of Pennsylvania to one

count of conspiracy to distribute cocaine base, in violation of 21 U.S.C. § 846 ("the Federal

Conviction").  On February 5, 1996, he was sentenced to five years' imprisonment and five

years' supervised release.  In 2004, jurisdiction over Gundy was transferred from the Eastern

District of Pennsylvania to the District of Maryland.

      On October 3, 2005, Gundy entered an *Alford* plea in a Maryland state court to the crime

of Sexual Offense in the Second Degree ("the Maryland Conviction").  That same day, he was

sentenced in Maryland state court to 20 years' imprisonment and five years' probation, with 10

years of the 20-year sentence suspended.

      On March 23, 2006, Gundy appeared in the United States District Court for the District

of Maryland and admitted to a violation of his federal supervised release based on the Maryland

Conviction.  He was sentenced to 24 months' imprisonment and the remainder of his supervised release was terminated.  This sentence was to be served consecutively to his Maryland sentence.

On June 15, 2011, Gundy was transferred from the custody of Maryland to the custody of the Bureau of Prisons (BOP) to serve the sentence imposed by virtue of his violation of the terms of his supervised release.  Ultimately, he was sent to FCI Schuylkill in Minersville, Pennsylvania.

On March 23, 2012, Gundy signed a "Community Based Program Agreement."  The Agreement contemplated that he would become "a resident" of an unspecified "residential reentry center [RRC] or work release program."  On May 8, 2012, he signed a form titled "Conditions of Furlough."  On June 7, 2012, Gundy signed a "Furlough Application – Approval and Record," which indicated that the "[p]urpose of the visit" that he sought was "[p]lacement in [an] RRC" in the Bronx, New York.  This application stated that the "Method of Transportation" would be "bus/taxi."  On June 12, 2012, the warden of FCI Schuylkill approved Gundy's furlough.  That day, the warden signed a "Transfer Order" authorizing Gundy's transfer from FCI Schuylkill to the Bronx Residential Re-Entry Center in the Bronx, New York ("the Bronx RRC").  Gundy acknowledged that:

> I understand that if approved, I am authorized to be only in the area of the destination shown above and at ordinary stopovers or points on a direct route to or from that destination.  I understand that my furlough only extends the limits of my confinement and that I remain in the custody of the Attorney General of the United States.

The furlough conditions limited approval to Gundy's "remain[ing] in the legal custody of the U.S. Attorney General, in service to a term of imprisonment."  The warden also signed a form stating that Gundy had been "authorized for unescorted commitment" to the Bronx RRC.

2

On July 17, 2012, Gundy traveled via Greyhound bus from Schuylkill Haven, Pennsylvania to New York City and reported to the Bronx RRC. He was released from the Bronx RRC on August 27, 2012. Upon being released from the Bronx RRC, Gundy remained in the Bronx. He did not register as a sex offender in either New York or Maryland.

On September 13, 2012, Maryland issued a warrant for Gundy's arrest based on violation of the conditions of his probation relating to the Maryland Conviction. On October 24, 2012, law enforcement personnel arrested Gundy in the Bronx and transferred him to the custody of Maryland. Gundy was later transferred to the custody of the BOP. On January 7, 2012, Gundy was charged in this District with one count of violating 18 U.S.C. § 2250.

## II.     Standard of Review

"Since federal crimes are solely creatures of statute, a federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute." *United states v. Zahavi*, 12 Cr. 288, 2012 WL 5288743, at *1 (S.D.N.Y. Oct. 26, 2012) (quoting *United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012)); *see also* Fed. R. Crim. P. 12(b)(2) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."). "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

## III.    Discussion

### A.     SORNA

On July 27, 2006, Congress enacted the Adam Walsh Child Protection and Safety Act of 2006 ("the Walsh Act"), Pub. L. No. 109-248, 120 Stat. 587. Title I of the Walsh Act codified

SORNA, the declared purpose of which is to "protect the public from sex offenders and offenders against children . . . [by] establish[ing] a comprehensive national system for the registration of those offenders."  42 U.S.C. § 16901.  Congress's principal purpose in enacting SORNA was "to make sure sex offenders could not avoid all registration requirements just by moving to another state."  *United States v. Guzman*, 591 F.3d 83, 91 (2d Cir. 2010).  As the Second Circuit has explained, "[r]equiring sex offenders to update their registrations due to intrastate changes of address or employment status is a perfectly logical way to help ensure that states will more effectively be able to track sex offenders when they do cross state lines."  *Id.*

Title 18, United States Code, Section 2250(a) makes it a federal crime for certain sex offenders to violate SORNA's registration requirements.  Section 2250 provides:

(a) **In General.—** Whoever—

(1) is required to register under [SORNA];

(2)

(A) is a sex offender as defined for the purposes of [SORNA] by reason of a conviction under Federal law (including the Uniform Code of Military Justice), the law of the District of Columbia, Indian tribal law, or the law of any territory or possession of the United States; or

(B) travels in interstate or foreign commerce, or enters or leaves, or resides in, Indian country; and

(3) knowingly fails to register or update a registration as required by [SORNA];

shall be fined under this title or imprisoned not more than 10 years, or both.

(b) **Affirmative Defense.—** In a prosecution for a violation under subsection (a), it is an affirmative defense that—

> (1) uncontrollable circumstances prevented the individual from complying;
>
> (2) the individual did not contribute to the creation of such circumstances in reckless disregard of the requirement to comply; and
>
> (3) the individual complied as soon as such circumstances ceased to exist.

Read together, the subsections of § 2250 create criminal liability when the Government can prove three elements: (1) the defendant was required to register under SORNA; (2) the defendant traveled in interstate or foreign commerce; and (3) the defendant knowingly failed to register or update a registration as required by SORNA. "For a defendant to violate this provision . . . the statute's three elements must be satisfied in sequence, culminating in a post-SORNA failure to register." *Carr v. United States*, 130 S. Ct. 2229, 2235 (2010). Thus if a sex offender travels in interstate commerce and then fails to register before becoming subject to SORNA's registration requirements, he cannot be found guilty for violating § 2250(a).

In relevant part, SORNA's registration requirements are set forth in 18 U.S.C. § 16913:

> (a) **In general**
>
>> A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student. For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.
>
> (b) **Initial registration**
>
>> The sex offender shall initially register—
>
>>> (1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or

> (2) not later than 3 business days after being
> sentenced for that offense, if the sex offender is not
> sentenced to a term of imprisonment.

> (c) **Keeping the registration current**

> > A sex offender shall, not later than 3 business days after
> > each change of name, residence, employment, or student
> > status, appear in person in at least 1 jurisdiction involved
> > pursuant to subsection (a) and inform that jurisdiction of all
> > changes in the information required for that offender in the
> > sex offender registry. That jurisdiction shall immediately
> > provide that information to all other jurisdictions in which
> > the offender is required to register.

> (d) **Initial registration of sex offenders unable to comply with**
> **subsection (b)**

> > The Attorney General shall have the authority to specify
> > the applicability of the requirements of this subchapter to
> > sex offenders convicted before the enactment of this
> > chapter or its implementation in a particular jurisdiction,
> > and to prescribe rules for the registration of any such sex
> > offenders and for other categories of sex offenders who are
> > unable to comply with subsection (b).

"Absent a valid rule by the Attorney General, SORNA is not retroactive to defendants . . . who

were convicted of sex offenses requiring them to register before July 27, 2006." *United States v.*

*Stevenson*, 676 F.3d 557, 560 (6th Cir. 2012); *see also Reynolds v. United States*, 132 S. Ct. 975,

984 (2012) ("[T]he Act's registration requirements do not apply to pre-Act offenders until the

Attorney General so specifies" pursuant to 42 U.S.C. § 16913); *United States v. Herbert*, 09 Cr.

438, 2009 WL 4110472, at *3 (N.D.N.Y. Nov. 20, 2009) ("Congress delegated to the Attorney

General the authority to define the retroactive application of SORNA's provisions to sexual

offenders whose convictions occurred before the passage of SORNA by Congress or before the

full implementation of SORNA by a given jurisdiction." (citing 42 U.S.C. § 16913)).

6

On February 28, 2007, the Attorney General promulgated an interim regulation providing that "[t]he requirements of [SORNA] apply to all sex offenders, including sex offenders convicted of the offense for which registration is required prior to the enactment of that Act."  72 Fed. Reg. 8894-01 ("the Interim SORNA Regulation").  On August 1, 2008, the "SMART Guidelines" went into effect.  The Guidelines provided that:

> The applicability of the SORNA requirements is not limited to sex offenders whose predicate sex offense convictions occur following a jurisdiction's implementation of a conforming registration program.   Rather, SORNA's requirements took effect when SORNA was enacted on July 27, 2006, and they have applied since that time to all sex offenders, including those whose convictions predate SORNA's enactment.

73 Fed. Reg. 38,030.  The Sixth Circuit has described the provenance of these guidelines:

> On May 30, 2007, the Attorney General published proposed guidelines from the Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, called the SMART guidelines.  The SMART guidelines stated that they were promulgated pursuant to the Attorney General's authority under 42 U.S.C. § 16912(b) to interpret and implement SORNA and restated the Attorney General's position that SORNA applied to all sex offenders, "including those whose convictions predate the enactment of the Act."  72 Fed. Reg. 30,210, 30,212.   These guidelines were made open to comments until August 1, 2007.  On July 2, 2008, the Attorney General published the final version of the SMART guidelines. 73 Fed. Reg. 38,030.  In the final version, the Attorney General responded to comments regarding the issue of retroactivity, but kept the language the same.  The final SMART guidelines stated their effective date as July 2, 2008, the date of publication.

*Stevenson*, 676 F.3d at 560; *see also United States v. Kidd*, 11 Cr. 20, 2011 WL 3352457, at *2-3 (E.D. Tenn. Aug. 3, 2011) *aff'd*, 12-5420, 2013 WL 870263 (6th Cir. Mar. 11, 2013).  On January 28, 2011, without conceding that the Interim Rule and the SMART Guidelines were invalid, the Attorney General responded to further comments on the issue of retroactivity and

finalized the Interim Rule to dispel any doubts regarding SORNA's retroactivity.  75 Fed. Reg.

81,849, 81,850.  This final regulation provided that "[t]he requirements of [SORNA] apply to all

sex offenders, including sex offenders convicted of the offense for which registration is required

prior to the enactment of that Act."  28 C.F.R. § 72.3 ("the Final SORNA Regulation").  The

Attorney General stated that the effective date of this latest final rule was January 28, 2011.

> **B.      Whether Gundy Was "Required to Register" Under SORNA When He Traveled in Interstate Commerce**

Gundy argues that the Indictment must be dismissed because he was not "required to

register" under SORNA prior to when he crossed state lines by traveling from Pennsylvania to

New York.  He adds that he became subject to this duty only when he completed his continuous

term of incarceration—at which point he was in New York.  The Government disputes Gundy's

arguments, insisting that Gundy has been subject to SORNA's registration requirements since

SORNA was rendered retroactive.  In the alternative, the Government might argue that Gundy

became required to register under SORNA upon the completion of the sentence that he served in

Maryland's prisons as punishment for the Maryland Conviction.

As an initial matter, the Government's suggestion that *every* sex offender has been

subject to SORNA's registration requirements, and "required to register" under SORNA, ever

since the Attorney General issued regulations rendering SORNA retroactive, must be rejected.

As the Supreme Court explained in *Carr* when presented with a similar argument:

> By its terms, the first element of § 2250(a) can only be satisfied
> when a person "is required to register *under the Sex Offender
> Registration and Notification Act*."    § 2250(a)(1) (emphasis
> added).  In an attempt to reconcile its preferred construction with
> the words of the statute, the Government insists that this language
> is merely "a shorthand way of identifying those persons who have
> a [sex-offense] conviction in the classes identified by SORNA."
> Brief for United States 19–20.  To reach this conclusion, the

> Government observes that another provision of SORNA, 42 U.S.C.
> § 16913(a), states that the Act's registration requirements apply to
> "sex offender[s]." A "sex offender" is elsewhere defined as "an
> individual who was convicted of a sex offense." § 16911(1).
> Thus, as the Government would have it, Congress used 12 words
> and two implied cross-references to establish that the first element
> of § 2250(a) is that a person has been convicted of a sex offense.
> Such contortions can scarcely be called "shorthand." It is far more
> sensible to conclude that Congress meant the first precondition to §
> 2250 liability to be the one it listed first: a "require[ment] to
> register under [SORNA]."

130 S. Ct. at 2235-36. While *Carr* was focused on policing the line between pre-Act and post-Act offenders, its point is more generally applicable: the status of being required to register under SORNA is not coextensive with the status of being a sex offender. Further, *Carr* must be taken as a caution that this first requirement—which sets in motion the sequence of events leading to criminal liability under § 2250—plays an essential role in the statutory scheme and has content independent of being subject *in general* to one or another of SORNA's requirements. *See id.* at 2238 ("Had Congress intended to subject any unregistered state sex offender who has ever traveled in interstate commerce to federal prosecution under § 2250, it easily could have adopted language to that effect."). Moreover, as explained *infra*, the Government's broad view of when a sex offender becomes required to register is incompatible with the statutory text.

Because SORNA was passed on July 27, 2006 and Gundy entered his *Alford* plea to the crime of Sexual Offense in the Second Degree in October 3, 2005, he is a pre-Act offender. The applicability of SORNA's registration requirements is therefore governed by § 16913(d), which authorizes the Attorney General to issue retroactivity guidelines. The Attorney General first did so on February 28, 2007 with the Interim SORNA Regulation, which provided that SORNA's requirements "apply to all sex offenders," including pre-Act offenders. He then promulgated the SMART Guidelines, which became effective on August 1, 2008 and stated that "SORNA's

requirements took effect when SORNA was enacted on July 27, 2006, and they have applied

since that time to all sex offenders, including those whose convictions predate SORNA's

enactment."  Courts have split over whether the Interim SORNA Regulation survives scrutiny as

administrative action, *see United States v. Reynolds*, 710 F.3d 498, 507 (3d Cir. 2013), but the

SMART Guidelines have consistently survived such challenges, *see United States v. Kimble*, No.

11 Cr. 611, 2012 WL 5906863, at *2 (W.D.N.Y. Nov. 26, 2012) (finding that "the SMART

Guidelines established that SORNA became effective in 2008"); *United States v. Mullins*, No. 11

Cr. 103, 2012 WL 3777067, at *3 (D. Vt. Aug. 29, 2012) ("This Court has already followed

every circuit to reach the question in holding that the Attorney General exercised his authority to

declare the law applied to pre-Act offenders . . . when the SMART Guidelines took effect.").

    Thus, at least as of August 1, 2008, while still serving his Maryland sentence, Gundy

became subject to § 2250 and § 16913.  *Stevenson*, 676 F.3d at 565 ("[T]he SMART guidelines

can and do have the force and effect of law, and they establish that SORNA became retroactive

as of August 1, 2008.").  Section 16913(a), however, distinguishes between normal registration

requirements and the initial registration requirement, providing that "a sex offender shall register

. . . in each jurisdiction where the offender resides . . . .  [and] *for initial registration purposes*

*only*, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is

different from the jurisdiction of residence" (emphasis added).  Tracking this distinction, §

16913(b) provides that a "sex offender *shall initially register*—(1) *before completing a sentence*

*of imprisonment with respect to the offense giving rise to the registration requirement*"

(emphasis added).  SORNA thus describes a general registration requirement and provides for an

initial registration scheme.  Any authority exercised by the Attorney General pursuant to §

16913(d) would have rendered both § 16913(a) *and* § 16913(b) retroactive.

It would be nonsensical to conclude that Gundy was "required to register" under SORNA for purposes of § 2250(a)(1) *before* the date on which was required to "initially register" under § 16913.  Therefore, a natural reading of § 16913(b)—together with other applicable law— suggests that Gundy's duty to register under SORNA did *not* become active on the date the SMART Guidelines took effect, on which date Gundy was serving his Maryland sentence.  In other words, the SMART Guidelines did not render all pre-Act offenders immediately subject to a duty to register, such that the first element of SORNA will always be met for all pre- and post-Act sex offenders (also known as *all* sex offenders).  Rather, as a pre-Act offender, Gundy became subject to SORNA's many requirements at least of the date the SMART Guidelines became effective.  Those general requirements, however, include the specific requirement that a sex offender initially register "*before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement*" (emphasis added).  This logic is confirmed by the SMART Guidelines, which explain that for sex offenders in prisoner populations at the time of SORNA's implementation, registration within the "normal SORNA time frame" means, as relevant here, "before release from imprisonment."  73 Fed. Reg. at 38,064.  Gundy's sentence of imprisonment in Maryland for the sex offense to which he entered an *Alford* plea on October 3, 2005 plainly qualifies as a sentence covered by § 16913(b).  Therefore, Gundy was not required to register under SORNA at least until the end of that prison term.

The critical question, however, is whether Gundy's period of incarceration in Maryland, Pennsylvania, and New York for violation of the terms of his federal supervised release qualifies under § 16913(b) as a "sentence of imprisonment *with respect to* the offense giving rise to the registration requirement."  If so, then Gundy did not become subject to SORNA's registration requirement until he was released from custody inside New York and Gundy's motion must be

granted.  If not, then Gundy became subject to SORNA's registration requirements at the end of the sentence imposed by Maryland's courts and his motion must be denied as to this argument.

The reading of § 16913(b) that best reconciles SORNA's text and purpose is that which *does* treat Gundy's sentence for violation of supervised release as "a sentence of imprisonment with respect to the offense giving rise to the registration requirement."

"As in any statutory construction case," analysis starts with the statutory text and "proceed[s] from the understanding that [u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning."  *Sebelius v. Cloer*, No. 12-236, 2013 WL 2149791, at *5 (U.S. May 20, 2013) (internal quotation marks and citations omitted).  "If the text of a statute is ambiguous, then [the Court] must construct an interpretation consistent with the primary purpose of the statute as a whole."  *United States v. Ripa*, 323 F.3d 73, 81 (2d Cir. 2003).  Where a statutory ambiguity persists after examination of a statute's text, structure, and purpose, the rule of lenity places a thumb on the scale against a finding of criminal liability.  *See United States v. Santos*, 553 U.S. 507, 514 (2008).  All three of these rules apply here.

As explained *supra*, § 16913(b) requires inmates to "initially register" after completing a prison term "*with respect to* the offense giving rise to the registration requirement."  (emphasis added).  This language, which is not addressed by SORNA's legislative history, is less than a model of clarity in specifying the required relationship between the "sentence of imprisonment" and the "offense giving rise to the registration requirement."  The key term is "with respect to."

On the one hand, "with respect to" might be understood as "imposed as punishment for" the registration offense.  On the other hand, "with respect to" might be understood in a broader sense as "relating to," "arising from," "regarding," or "in connection with."  *See, e.g.*, *American Heritage Dictionary* (4th ed. 2001) (defining "respect" as, *inter alia*, a verb that means "to relate

12

or refer to; concern"); *Oxford English Dictionary* (2d ed. 1989) (identifying "with respect to" as definition I.4.e and cross-referencing to I.7.b., which defines "with respect" as meaning, *inter alia*, "[w]ith reference or regard *to* something" (emphasis in original)); *see also id.* (offering many definitions of "respect" that emphasize the relational character of this term, such as "1. *To have respect to*: a. To have regard or relation to, or connexion with, something . . . . b. To have reference, to refer, to something . . . 2. *To have respect to*: a. To turn *to*, refer *to*, for information . . . c. To give heed, attention, or consideration *to* something; to have regard *to*; to take into account). Indeed, courts have made very different use of the term "with respect to." *See, e.g.*, *Magwood v. Patterson*, 130 S. Ct. 2788, 2806 (2010) (holding a habeas corpus application is "second or successive" for purposes of AEDPA where, "with respect to" a claim, the alleged error "could and should have" been raised in the first petition); *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 n.4 (2d Cir. 2013) (examining circumstances under which a person "is a fiduciary with respect to a plan" under ERISA, and noting that when an entity acts with "dual roles," fiduciary duties are only implicated when it functions in its capacity as a fiduciary). The common thread across these opinions and definitions is that "with respect to" connotes a connection with or relationship to, though not necessarily or even usually a state of identity with, the object of the phrase.

In most cases, this ambiguity in the meaning of "with respect to" will not matter. If a sex offender serves a prison sentence for the offense that creates the duty to register, and is then released from custody, his duty is activated at the end of his time in prison. If that sex offender is later caught and convicted of another crime, the question whether he is obligated to register while in prison does not implicate the initial registration issue that the parties dispute in this case.

Gundy's situation, however, directly implicates the ambiguity in § 16913(b)'s reference to a "sentence of imprisonment *with respect to* the offense giving rise to the registration requirement" (emphasis added). Unlike most offenders—and unlike the typical offender that Congress and the Attorney General likely imagined when crafting the applicable law—Gundy completed a sentence of imprisonment for his Maryland sex offense and then *immediately* began a consecutive sentence of imprisonment for his violation of federal supervised release, a violation premised on the same underlying Maryland sex offense. This transition occurred while he was incarcerated in the same prison in Maryland; one day, he was in the same cell for a different reason. He was never released from prison. He was not even moved to a different prison, at least not initially. And the violation that caused his supervised release sentence consisted of exactly the same conduct that gives rise to his registration requirement. Gundy thus served back-to-back sentences for a single course of conduct—his sex offense—which simultaneously broke Maryland's criminal code and the terms of his supervised release.

On this fact pattern, the textual question is whether Gundy's time in prison for violating his supervised release in this manner qualifies as a sentence "with respect to" his Maryland sex offense. The answer is no if the text is read to mean "imposed as punishment for the offense giving rise to the registration requirement." The answer is yes if the text is read to mean "relating to," "arising from," or "in connection with" the offense giving rise to the registration requirement. The difference is thus all-important to Gundy, yet unsusceptible to resolution through analysis keyed only to the statute's plain language. The phrase "with respect to" is too ambiguous in this context to serve as the definitive predicate of Gundy's conviction.

A combination of statutory purpose and rule of lenity must therefore guide the outcome. Starting with purpose, SORNA's criminal provisions are "not a stand-alone response to the

14

problem of missing sex offenders." *Carr*, 130 S. Ct. at 2240.  Rather, § 2250 is "embedded in a broader statutory scheme enacted to address the deficiencies in prior law that had enabled sex offenders to slip through the cracks." *Id.*  That scheme includes provisions "repealing several earlier federal laws that also (but less effectively) sought uniformity; [] setting forth comprehensive registration-system standards; [] making federal funding contingent on States' bringing their systems into compliance with those standards; [] requiring both state and federal sex offenders to register with relevant jurisdictions (and to keep registration information current); and [] creating federal criminal sanctions applicable to those who violate the Act's registration requirements." *Reynolds*, 132 S. Ct. at 978.

Section 2250 thus plays a limited, though important, role in the larger SORNA scheme: "mak[ing] sure sex offenders could not avoid all registration requirements just by moving to another state." *Guzman*, 591 F.3d at 91.  This is why "[t]he act of travel by a convicted sex offender may serve as a jurisdictional predicate for § 2250, but it is also, like the act of possession [under 18 U.S.C. § 922(g)], the very conduct at which Congress took aim." *Carr*, 130 S. Ct. at 2240.  Thus, when sex offenders "use the channels of interstate commerce in evading a State's reach," their conduct implicates the animating purpose of SORNA's criminal provisions. *Id.* at 2238.  Otherwise, however, Congress has given "the States primary responsibility for supervising and ensuring compliance among state sex offenders." *Id.*

Given that there is virtually no risk that a sex offender will fall through the cracks or go missing while incarcerated, it would make little sense to apply SORNA's registration requirements and criminal provisions to incarcerated individuals.  In fact, Congress recognized that the public is adequately protected against sex offenders locked behind bars: this is why sex offenders are not required under § 16913(b) to initially register until the *end* of their post-

15

conviction carceral sentences.  The Attorney General's SMART Guidelines confirm that

"SORNA's registration requirements generally come into play *when sex offenders are released*

*from imprisonment*, or when they are sentenced if the sentence does not involve imprisonment."

73 Fed. Reg. at 38,045 (emphasis added).  The Guidelines add that "'imprisonment' as it is used

in SORNA and these Guidelines refers to incarceration pursuant to a conviction, regardless of

the nature of the institution in which the offender serves the sentence."  *Id.*

   This logic, which presupposes that there is little purpose to imposing a duty of initial

registration on an incarcerated sex offender, appears again later in the SMART Guidelines:

> *Example 3*: A sex offender convicted in 1980 for an offense
> subject to lifetime registration under SORNA is released from
> imprisonment in 1990 but is not required to register at the time
> because the jurisdiction had not yet established a sex offender
> registration program.  In 2010, following the jurisdiction's
> implementation of SORNA, the sex offender reenters the system
> because of conviction for a robbery.  The jurisdiction will need to
> require the sex offender to register based on his 1980 conviction
> for a sex offense when he is released from imprisonment for the
> robbery offense.  But it is not possible to carry out the initial
> registration procedure for the sex offender prior to his release from
> imprisonment for the registration offense—i.e., the sex offense for
> which he was convicted in 1980-because that time is past . . .
>
> . . . . In [cases like Example 3], the normal SORNA initial
> registration procedures and timing requirements will apply, but
> with the new offense substituting for the predicate registration
> offense as the basis for the time frame.  In other words, such a sex
> offender must be initially registered in the manner specified in
> SORNA § 117(a) prior to release from imprisonment for the new
> offense that brought him back into the system, or within three
> business days of sentencing for the new offense in case of a non-
> incarcerative sentence.

73 Fed. Reg. at 38,063-64.  Here, even though the offender would be incarcerated on a different

offense than the offense giving rise to his duty to register, the Attorney General instructs states to

view the initial registration requirement as one that arises at the *end* of the carceral sentence.

This provision reflects SORNA's basic logic, which does not treat incarcerated sex offenders as a group subject to a duty of initial registration during their time in prison.

A clear focus on offenders outside of custody runs through SORNA's text and its implementing regulations.  Section 16913 requires offenders to register in each jurisdiction in which they reside, work, or study—requirements that all envision individuals outside of prison, free to go about their lives in multiple jurisdictions.  Offenders are also required to periodically appear in person to keep their registration current, a mandate that further exemplifies Congress's presupposition that offenders with a duty to register are out of custody.

In the same vein, 42 U.S.C. § 16915(a) requires sex offenders to keep their "registration current for the full registration period (excluding any time the sex offender is in custody or civilly committed) unless the offender is allowed a reduction under subsection (b) of this section."  Offenders are thus relieved of the obligation to keep their registration current while incarcerated—yet another feature of SORNA's registration scheme that indicates Congress's focus on out-of-custody offenders and its recognition that the purposes of SORNA's criminal provisions are not ordinarily fulfilled by imposing registration requirements on incarcerated offenders.  *See also* 42 U.S.C. § 16914 (requiring that as part of registration, offenders provide information of a sort associated with being out of custody rather than imprisoned, including license plate numbers for any cars they drive and information about where they work).  The SMART Guidelines accordingly recognize that "[t]he proviso relating to custody or civil commitment" in § 16915(a) "reflects the fact that the SORNA procedures for keeping up the registration . . . generally presuppose the case of a sex offender who is free in the community."  They do so, the Guidelines explain, because "[w]here a sex offender is confined, the public is protected against the risk of his reoffending in a more direct way, and more certain means are

17

available for tracking his whereabouts.  Hence, SORNA does not require that jurisdictions apply the registration procedures applicable to sex offenders in the community during periods in which a sex offender is in custody or civilly committed."  73 Fed. Reg. at 38,068.

Thus, as manifested in its statutory text and implementing regulations, SORNA's purpose is not ordinarily served by imposing on inmates who have not been released from prison following their sex offense conviction a duty of initial registration.[1]

In many cases, such a requirement could lead to absurd results.  Inmates are regularly moved between jurisdictions while in custody.  Often, these transfers are orchestrated without their consent.  Even if those inmates enjoyed an affirmative defense under § 2250(b) to liability under § 2250(a) for failure to register while imprisoned, the result would that a significant number of inmates have already satisfied elements (1) and (2) of § 2250 the moment they step past prison gates on their way to freedom.  Failure to register within a short period would then perfect the § 2250 offense and return them to federal prison for an offense that, in the usual course, would implicate only the requirements of state sex offender registration schemes.

The Government's proposed interpretation of SORNA would thus result in a disruption of the state-federal balance contemplated by Congress, as it would federalize a large swath of post-custody failure-to-register offenses that do not reflect any uniquely federal power or concern.  *See Carr*, 130 S. Ct. at 2238 (noting that Congress has given "the States primary responsibility for supervising and ensuring compliance among state sex offenders"); *see also United States v. Van Buren, Jr.*, No. 8 Cr. 198, 2008 WL 3414012, at *13 (N.D.N.Y. Aug. 8, 2008) *aff'd sub nom. United States v. Van Buren*, 599 F.3d 170 (2d Cir. 2010) (noting that

---

[1] A different question may arise if an inmate is released from custody, spends time in society, and is then returned to prison, but that question is not presented by this motion.

SORNA "does not offend traditional notions of federalism *because it addresses something each state does not have the power to accomplish*—track registered sexual offenders as they move from state to state." (emphasis added)).  Moreover, this disruption in federalism would arise in a context shot through with questions of fundamental fairness, since in many cases the predicate act of interstate travel would have been imposed on an unwilling sex offender—who might well be excused from recognizing that failure to register in his new state violates SORNA, instead of state law.  Ultimately, the Government's view would undercut the purpose and logic of SORNA's criminal liability provisions.  As the Second Circuit recognized in *Guzman*, § 2250 is designed to make sure that sex offenders cannot dodge registration requirements by skipping from one state to another.  591 F.3d at 91.  The interstate travel is thus the very act at which SORNA takes aim.  *See Carr*, 130 S. Ct. at 2238-40.  Where an inmate is in continuous carceral custody throughout his period of interstate travel, and is therefore being monitored by the government at every step along the way, it defies reason to view a post-release failure to register as an effort to "use the channels of interstate commerce in evading a State's reach."  *Id.*

There is no reason to believe that all these considerations are any less decisive in Gundy's case.  He was incarcerated continuously throughout his consecutive sentences.  He did not present a danger that the government would lose him, that he would fall through the cracks, or that he would "use the channels of interstate commerce in evading a State's reach."  *Carr*, 130 S. Ct. at 2238.  He did not pose a danger to the community while in prison.  He would have been required to register upon his release from custody wherever that release took place; there is no reason to believe that his failure to register after being released from custody in New York implicates SORNA's purposes any more than his failure to register would have done had he been released in Maryland.  In either case, he could have been punished by the state government for

19

failing to register, or by the federal government if he subsequently moved in interstate commerce and knowingly failed to register as required by SORNA.  In sum, it would not advance any core purpose of SORNA to conclude that Gundy's supervised release sentence was *not* a sentence of imprisonment "with respect to" his Maryland sex offense.  SORNA is not designed to ensure that prisoners can be arrested for a federal crime in the very state where they are released from prison for the first time after serving a sentence "with respect to" their sex offense.[2]

       This conclusion is bolstered by the rule of lenity.  As Justice Scalia has explained:

> Under a long line of our decisions, the tie must go to the defendant. The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.  This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed.  It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*Santos*, 553 U.S. at 514.  Section 16913 is sufficiently ambiguous that even experienced counsel would have been hard-pressed to explain to Gundy his potential liability for failing to register upon his release from the RRC in New York.  Given that Congress has not spoken clearly, that the notice function associated with statutory criminal law was clouded by ambiguity, and that the purposes of SORNA weigh against the imposition of liability, a construction of SORNA that precludes liability here is required.

---

[2] The Government raises the specter of a constitutional concern with this conclusion, since post-revocation penalties relate to the initial offense—and would raise an issue of double jeopardy if they were treated as punishment for the new criminal offense.  *See Johnson v. United States*, 529 U.S. 694, 700 (2000).  But that concern is misplaced.  Acknowledging that Gundy's sentence for violation of his supervised release is a sentence "with respect to" his Maryland criminal offense is not the same as concluding that it constitutes punishment for that offense.  In other words, the Court can recognize the reality of a relationship between Gundy's conduct in Maryland and his post-revocation penalties without implicating the double jeopardy issue noted in *Johnson*.  As a result, there is no need to construe "with respect to" in the shadow of constitutional avoidance.

The SMART Guidelines do not alter—and in fact support—this conclusion.  In the Guidelines, the Attorney General states that "jurisdictions must normally require that sex offenders be initially registered before release from imprisonment for the registration offense." He adds that, under § 117(a) of SORNA, "initial registration procedures are to be carried out 'shortly before release of the sex offender from custody' . . . . [J]urisdictions should implement this requirement in light of the underlying objectives of ensuring that sex offenders have their registration obligations in mind when they are released."  73 Fed. Reg. at 38,063.  The Attorney General later notes that if a pre-Act offender started his carceral sentence *before* SORNA took effect and is released on "completion of imprisonment" *after* SORNA takes effect, that offender "can be registered prior to release from imprisonment in the same manner as sex offenders convicted following the enactment of SORNA and its implementation by the jurisdiction."  *Id.*

Each of these SMART Guidelines provisions expressly contemplates a scenario in which the sex offender at issue is released from custody at the end of his term of imprisonment for the "registration offense."  Thus, jurisdictions must "normally" require registration at that point—a qualification that implies the existence of cases where the duty to register does *not* attach at the end of the sentence imposed as punishment for the registration offense.  This is one such case, as Gundy's consecutive sentence makes him unlike the "normal" sex offender.  Further, states must register an offender before he is "released from custody," on "completion of imprisonment," or on "release from imprisonment."  This language further supports the conclusion that the Attorney General was not considering a situation like Gundy's in promulgating these rules.  Even to the extent that Gundy was technically "released" from imprisonment for his registration offense when the basis for incarceration in Maryland shifted from a state crime to violation of supervised release, his continued presence behind bars removed him from the class of offenders

21

contemplated by the plain terms of the SMART Guidelines.  Thus, the SMART Guidelines arguably endorse Gundy's view of when he was required to register, since they repeatedly and logically link the initial registration requirement to release from custody.[3]  In the alternative, they are ultimately silent as to this matter because it is not a "normal[]" case and the Court must look directly to § 16913(b)—the statute that the Attorney General is interpreting in the Guidelines.

The upshot of this analysis is that Gundy's duty to initially register was triggered shortly before he was released from custody in New York.  Gundy was in custody when transferred from the Maryland prison to FCI Schuylkill, and then, by the plain language of the transfer documents, remained in the "legal custody of the [Attorney General], in service to a term of imprisonment" during his unsupervised transfer from Pennsylvania to New York.  These documents confirmed that his transfer "only extend[ed] the limits of [his] confinement" and his "custody."  As a sex offender who was imprisoned for committing a sex offense and who then remained in custody continuously through his release in New York—first while serving a sentence imposed as punishment for the sex offense, and then while serving a post-revocation sentence "with respect to" the sex offense—Gundy was not "required to register" when he engaged in the interstate travel alleged in the Indictment and therefore cannot be held liable for a violation of § 2250.

Accordingly, the Indictment must be dismissed.

### C.    Gundy's Other Arguments In Support of Dismissal

Gundy also advances a number of other arguments in support of dismissal.  Because the Court has granted his motion on statutory grounds, it need not reach his constitutional claims.

---

[3] This analysis might be different if Gundy had been sentenced to consecutive prison terms for crimes that bore no relation—for instance, a sex offense and then an unrelated bank robbery— since in that scenario the robbery sentence might not qualify as a term of imprisonment "with respect to" to the sex offense.  However, that issue is not presented in this case.

**IV.**     **Conclusion**

For the foregoing reasons, Defendant's motion to dismiss the indictment is GRANTED.


SO ORDERED.

Dated: New York, New York
       May 22, 2013

_____
                     J. PAUL OETKEN
                 United States District Judge